E-Filed

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | CV 13-5269-GHK (FFMx) | Date | November 27, 2013 |
|---|---|---|---|
| Title | *Aimee Mann v. MediaNet Digital, Inc., et al.* | | |

| Presiding: The Honorable | **GEORGE H. KING, CHIEF U.S. DISTRICT JUDGE** | |
|---|---|---|
| Beatrice Herrera | N/A | N/A |
| Deputy Clerk | Court Reporter / Recorder | Tape No. |
| Attorneys Present for Plaintiffs: | Attorneys Present for Defendant: | |
| None | None | |

**Proceedings:**     **(In Chambers) Order re:** Defendant's Motion to Dismiss [Dkt. No. 20]

This matter is before us on Defendant's Motion to Dismiss Plaintiff's First Amended Complaint ("FAC"). We have considered the papers filed in support of and in opposition to the Motion and deem this matter appropriate for resolution without oral argument. L.R. 7-15. As the Parties are familiar with the facts, we will repeat them only as necessary. Accordingly, we rule as follows:

**I.   Background**

Plaintiff Aimee Mann ("Mann"), a songwriter and recording artist, brought this copyright infringement action against Defendant MediaNet Digital, Inc. ("MediaNet"), f/k/a MusicNet, a distributor of streaming music, online radio, and music downloads to companies like Songza, Stub Hub, Soundtracker, MTV, Yahoo Music, and Time Warner Cable (among others). MediaNet also allows consumers to acquire music directly from its website, www.mndigital.com.

Mann's FAC[1] alleges the following: Mann owns the copyright to over 100 musical compositions.[2] (FAC ¶ 17, Ex. A). On December 5, 2003, Mann entered into an agreement with MediaNet that granted the company "a nonexclusive license to use, transmit, perform, reproduce, and deliver" her compositions to its authorized distributors and end users via its streaming and download services ("License Agreement").[3] (FAC ¶ 18; FAC Ex. B, License Agreement ¶ 2.1). For each stream

---

[1] Mann amended her original complaint to clarify that she did not intend to allege that MediaNet had infringed her public performance rights that were licensed to MediaNet by the American Society of Composers, Authors, and Publishers ("ASCAP").

[2] A music recording creates a copyright in both the musical composition (authored by the composer and lyricist) and the sound recording (authored by the performer, the record producer, or both). The copyrights to Mann's sound recordings are exclusively owned and controlled by Whatever Productions, Inc. d/b/a SuperEgo Records and have been licensed to MediaNet. (Pl. Opp. at 7).

[3] Additionally, for Mann's songs that she "first made available . . . during the Term of [the] Agreement," the License Agreement granted MediaNet "all rights and obligations of a statutory

E-Filed

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | CV 13-5269-GHK (FFMx) | Date | November 27, 2013 |
|---|---|---|---|
| Title | *Aimee Mann v. MediaNet Digital, Inc., et al.* | | |

or download of Mann's songs, MediaNet agreed to pay Mann a mechanical royalty at the statutory rate.[4] (FAC Ex. B, License Agreement ¶¶ 4.1, 4.2, 6.1). These payments were to be made within 45 days after the end of each calendar quarter. (*Id.*). Along with the fee payments, MediaNet also agreed to furnish an accounting report setting forth the number of times Mann's songs were streamed or downloaded via MediaNet's service during the fee period (as well as the total number of other streams and downloads made via MediaNet's service during the fee period). (FAC Ex. B, License Agreement ¶ 6.2).

The License Agreement had an initial three-year term with automatic two-year extensions, "unless terminated by either Party upon written notice of intention to terminate at least ninety days prior to the end of the Term or any Renewal Period, whereupon [the] Agreement [would] terminate at the end of such Term or Renewal Period." (FAC Ex. B, License Agreement ¶ 5). Based on the December 5, 2003 effective date, the initial term was set to end on December 4, 2006. (FAC ¶ 20).

Mann claims that on February 10, 2005, her representative, Leslie Wallake, sent MediaNet an email in which she indicated Mann wished to terminate the License Agreement. (FAC ¶ 21). The email was sent in response to an inquiry from John Jones, VP of Programming, Artist, and Label Relations at MediaNet. (FAC, Ex. C). In the brief email, Wallake informed Jones that Mann "has advised that [she] does not want to pursue an agreement with MusicNet at this time." (*Id.*). Mann contends that, pursuant to paragraph 5 of the License Agreement, this email caused the License Agreement to terminate at the end of the initial term, on December 4, 2006. (FAC ¶ 22). In addition, independent of her purported termination notice, Mann alleges the License Agreement ended on December 4, 2006 because its auto-renewal provision is unenforceable under New York General Obligations Law § 5-903.[5] (FAC ¶ 23).

Notwithstanding the termination of the License Agreement on December 4, 2006, MediaNet continued to transmit, reproduce, and distribute Mann's songs after the initial term had ended. (FAC ¶ 24). Despite this continued use of her songs, MediaNet allegedly did not send Mann any royalties or accounting reports after January 4, 2006. (FAC ¶ 65). This last payment was for the quarter-annual period ending on September 30, 2005. (*Id.*). The only payment Mann received from MediaNet after January 4, 2006 was a $20 check in March 2013. (FAC ¶ 66). Mann promptly returned this check to MediaNet because it "bore no relationship to the License Agreement or Section 115 of the Copyright Act." (*Id.*). Additionally, before, during, and after the term of the License Agreement, MediaNet offered other publishers more favorable terms than those offered to Mann, even though the License Agreement contained a provision in which MediaNet promised to treat Mann on a "most favored

---

licensee . . . for the full term of the copyright for the Musical Works." (FAC Ex. B, License Agreement ¶ 2.3). MediaNet was granted this statutory license for these works without "having to further serve or file a notice of intention to obtain a compulsory license" (*id.*), even though such notice is normally a prerequisite to obtaining a statutory license. *See* 17 U.S.C. § 115(b).

[4] The statutory mechanical royalty rate is determined pursuant to Section 115 of the Copyright Act. 17 U.S.C. § 115(c).

[5] The License Agreement provides that it is governed by New York law.

E-Filed

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | CV 13-5269-GHK (FFMx) | Date | November 27, 2013 |
|---|---|---|---|
| Title | *Aimee Mann v. MediaNet Digital, Inc., et al.* | | |

nations" ("MFN") "basis concerning [its] payment for mechanical license fees." (FAC ¶¶ 62, 63, 64).

Mann contends that MediaNet's failure to comply with the License Agreement's royalty, accounting, and MFN provisions after December 4, 2006 further suggests that the License Agreement had in fact ended on that date. (FAC ¶ 68). In the alternative, if the License Agreement is deemed to have not ended on December 4, 2006, Mann seeks to now rescind it for "material failure of consideration." (FAC ¶ 69). Mann contends that rescission of the License Agreement would provide an alternative basis for claiming that MediaNet's uses of Mann's compositions after December 4, 2006 constituted copyright infringement. (FAC ¶ 70).

Based on the foregoing, the FAC asserts five causes of action: (1) direct copyright infringement; (2) contributory copyright infringement; (3) vicarious copyright infringement; (4) inducing copyright infringement; and (5) rescission. Mann seeks damages, a constructive trust over the money obtained by MediaNet as a result of its illegal exploitation of her songs, a permanent injunction prohibiting the continued infringement of her songs, an order directing the impoundment or other reasonable disposition of MediaNet's infringing copies of her songs, and attorneys' fees. MediaNet now moves to dismiss each of Mann's five claims.

## II. Motion to Dismiss Standard

To survive dismissal for failure to state a claim, a complaint must set forth "more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). The complaint must contain factual allegations sufficient to "state a claim to relief that is plausible on its face." *Id.* at 555, 570; *see also Ashcroft v. Iqbal*, 556 U.S. 662, 678-79 (2009). Although we must accept the allegations of the complaint as true and construe them in the light most favorable to the plaintiff, we need not accept as true legal conclusions "cast in the form of factual allegations." *W. Mining Council v. Watt*, 643 F.2d 618, 624 (9th Cir. 1981). "In sum, for a complaint to survive a motion to dismiss, the non-conclusory 'factual content,' and reasonable inferences from that content, must be plausibly suggestive of a claim entitling the plaintiff to relief." *Moss v. U.S. Secret Serv.*, 572 F.3d 962, 969 (9th Cir. 2009).

## III. Discussion

### A. Copyright Claims

MediaNet argues that Mann's claim for direct infringement should be dismissed because: (i) MediaNet had a valid license at all relevant times and therefore cannot be liable for copyright infringement, and (ii) the License Agreement was not terminated on December 4, 2006 as a matter of law.

The viability of MediaNet's first argument, of course, is entirely contingent on its second argument. Based on clearly established case law (and simply as a matter of common sense), Mann

E-Filed

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | CV 13-5269-GHK (FFMx) | Date | November 27, 2013 |
|---|---|---|---|
| Title | *Aimee Mann v. MediaNet Digital, Inc., et al.* | | |

could not sue MediaNet for copyright infringement if MediaNet had a valid license at the time of the alleged infringement. But the entire thrust of Mann's FAC is that MediaNet exploited her works after December 4, 2006, when she alleges it no longer had a license. And as Mann correctly notes, "after expiration of a license, further exercise by the licensee of the licensed exploitation rights constitutes copyright infringement." *Wu v. Pearson Educ. Inc.*, 277 F.R.D. 255, 267 (S.D.N.Y. 1991) (quoting Nimmer on Copyright § 10.15). Accordingly, MediaNet can only prevail on its motion to dismiss Mann's copyright claim if it can show, as a matter of law, that it had a valid license to use Mann's songs at all relevant times.

### 1. Statutory Compulsory License

In her FAC, Mann alleges that MediaNet had neither a compulsory license nor a negotiated license to use her songs after December 4, 2006. Pursuant to Section 115 of the Copyright Act, a person may obtain a compulsory license to reproduce and distribute copyrighted musical works. *See* 17 U.S.C. § 115. To obtain such a compulsory license, a person must serve notice on the copyright owner thirty days before distributing the work. 17 U.S.C. § 115(b)(1). "Failure to serve or file [this] notice . . . forecloses the possibility of a compulsory license, and, in the absence of a negotiated license, renders the making and distribution of phonorecords actionable as acts of infringement . . . ." 17 U.S.C. § 115(b)(2). Here, Mann alleges that MediaNet had no compulsory license because it did not serve or file the required notice prior to its distribution of Mann's songs. (FAC ¶ 16).

Although MediaNet does not contend that it sent Mann any such notice, it suggests, in passing, that paragraph 2.3 of the License Agreement grants it an ongoing statutory license that remains in effect even after the termination of the License Agreement. (Mot. at 4). Paragraph 2.3 of the License Agreement granted MediaNet "all rights and obligations of a statutory licensee" for the entire duration of the works' copyright without MediaNet needing to "further serve or file a notice of intention to obtain a compulsory license" as usually required by Section 115. Mann concedes that this provision grants MediaNet some rights that continue after the License Agreement is terminated. (Opp. at 21). She insists, however, that it only applies to the songs that she composed while the License Agreement was in effect. (Opp. at 5). She points to language in paragraph 2.3 providing that it applies to "the Musical Works contained in [Mann's] Catalog that are first made available during the Term of [the License] Agreement." By its plain terms, Mann argues, paragraph 2.3 does not apply to the songs that she composed prior to the term of the License Agreement or after the term of the License Agreement because these songs were not "first made available" between December 5, 2003 and December 4, 2006. This is a reasonable interpretation of the License Agreement, and MediaNet has failed to argue otherwise. Accordingly, Mann has adequately alleged that MediaNet does not have a Section 115 compulsory license to use her pre-December 5, 2003 and post-December 4, 2006 songs.

### 2. Termination of Negotiated License

E-Filed

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | CV 13-5269-GHK (FFMx) | Date | November 27, 2013 |
|---|---|---|---|
| Title | *Aimee Mann v. MediaNet Digital, Inc., et al.* | | |

MediaNet's primary contention is that the License Agreement signed by Mann on December 5, 2003 remains in effect. Mann's FAC proffers several theories to support her claim that MediaNet no longer had a valid negotiated license after December 4, 2006: (i) the License Agreement's auto-renewal provision is unenforceable; (ii) Mann sent MediaNet timely notice of her intent to terminate; and (iii) the Parties conducted themselves as if the License Agreement had terminated. Mann's FAC states a valid claim for direct copyright infringement if any one of these theories adequately supports her allegation that the License Agreement terminated on December 4, 2006.

The allegations supporting Mann's first theory are straightforward. She contends that the License Agreement, as a contract involving a service for her property, was subject to New York General Obligations Law § 5-903. That statute provides, in relevant part:

> No provision of a contract for service . . . to or for any . . . personal property which states that the term of the contract shall be deemed renewed for a specified additional period unless the person receiving the service . . . gives notice to the person furnishing such contract service . . . of his intention to terminate the contract at the expiration of such term, shall be enforceable against the person receiving the service . . ., unless the person furnishing the service . . ., at least fifteen days and not more than thirty days previous to the time specified for serving such notice upon him, shall give to the person receiving the service . . ., written notice, served personally or by certified mail, calling the attention of that person to the existence of such provision in the contract.

Mann asserts that because MediaNet failed to alert her to the existence of the auto-renewal provision, the License Agreement was not automatically renewed after its initial term ended on December 4, 2006. (FAC ¶ 23).

MediaNet does not contend that it sent Mann notice of the License Agreement's auto-renewal provision, as required by § 5-903. Instead, MediaNet makes three arguments as to why § 5-903 is wholly inapplicable here: (i) it does not apply to intellectual property licenses; (ii) it was enacted to protect consumers; and (iii) it only protects the paying party. These arguments are unpersuasive.

First, MediaNet suggests that because no case has applied the statute to an intellectual property license, the "inescapable conclusion" must be that it does not apply in this context. (Reply at 6-7). What MediaNet fails to acknowledge, however, is that no court has held that § 5-903 does *not* apply to intellectual property licenses either. The silence of New York courts on this issue is a neutral factor – it leads to no "inescapable conclusion" of any kind. It is a well-settled principle, however, that intellectual property "is not distinguishable from any other personal property" and "has the benefit of all the remedies accorded to other property." *Palmer v. De Witt*, 47 N.Y. 532, 538 (1872). Accordingly, that the contract at-issue here involves intellectual property does not, in and of itself, disqualify Mann from the protections of § 5-903.

E-Filed

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | CV 13-5269-GHK (FFMx) | Date | November 27, 2013 |
|---|---|---|---|
| Title | *Aimee Mann v. MediaNet Digital, Inc., et al.* | | |

Second, MediaNet asserts that § 5-903 is solely a consumer protection statute and therefore affords no protection to Mann. This argument is also meritless. As support for its claim that § 5-903 was enacted to protect consumers, MediaNet simply uses a "see generally" signal to cite two secondary sources that discuss New York's consumer protection statues. This does not help MediaNet's argument. That two articles discuss § 5-903 alongside other consumer protection statutes in no way suggests that § 5-903 only protects consumers. Moreover, MediaNet's contention that § 5-903 has an exclusively consumer-protection bent is belied by the statute's plain language and New York case law. The word "consumer" appears nowhere in § 5-903. It is a fundamental canon of statutory construction that courts should not read words into a statute that do not appear on its face. *See, e.g., United States v. Great Northern Ry. Co.*, 343 U.S. 562, 575 (1952) ("It is our judicial function to apply statutes on the basis of what [the legislature] has written, not what [the legislature] might have written."). The New York legislature could have chosen to use this statute to protect only consumers, but the text of § 5-903 evinces the legislature's decision to give the statute a broader reach. New York courts have reasoned similarly and concluded that "the size of the party receiving the service rendered has nothing to do with the applicability of the statute." *Harris v. Adams & Co. Real Estate*, 310 N.Y.S.2d 258, 262-63 (Civ. Ct. 1970) ("The statute does not talk in terms of a party furnishing services, maintenance or repair to a large or small owner, consumer, or contracting party. It only says 'service, maintenance, and repair.'"). Furthermore, § 5-903 has been applied again and again to protect non-consumers. *See, e.g., Carbo Indus., Inc. v. Coastal Ref. & Mktg., Inc.*, 154 F. App'x 218, 219-20 (2d Cir. 2005) (applied to protect a company that contracted for storage services for its petroleum products); *Projection Video Servs., Inc. v. Inter-Cont'l Hotels Corp.*, 1999 WL 1267454, at *2-3 (S.D.N.Y. Dec. 29, 1999) (applied to protect the Hotel Inter-Continental New York, which had contracted for audio-visual equipment and services); *Johnson v. UniFirst Corp.*, 889 N.Y.S.2d 349, 350 (App. Div. 2009) (applied to protect welding corporation that contracted to rent uniforms); *Guerrero v. W. 23rd St. Realty, LLC*, 846 N.Y.S.2d 41, 42 (App. Div. 2007) (applied to protect real estate company that contracted for building management services).

MediaNet's final argument fares no better. MediaNet contends that § 5-903 only benefits the paying party and that, as a paying licensee of Mann's property, it has no obligations under the statute. New York case law reveals, however, that whether or not a party receives payments from the other party is in no way dispositive of whether it is entitled to protection under § 5-903. Instead, a party that pays to use property is still required to provide notice of the auto-renewal provision if it is also furnishing a service for that property. *See, e.g., NYDIC/Westchester Mobile MRI Associates, L.P. v. Lawrence Hospital*, 662 N.Y.S.2d 593, 594-95 (App. Div. 1997) (holding that company that paid hospital a fee to provide MRI services at hospital had to notify hospital of auto-renewal provision); *Hercules Corp. v. Beach View Apt. Corp.*, 2001 WL 34737599, at *4-5 (Sup. Ct. 2001) (holding that laundry service that paid monthly fee to install, operate, and maintain equipment in apartment building had to notify building of auto-renewal provision); *Dime Laundry Servs., Inc. v. 230 Apartments Corp.*, 466 N.Y.S.2d 117, 120-21 (Sup. Ct. 1983) (same). Thus, in deciding whether § 5-903 applies here, the only relevant questions are whether the License Agreement can fairly be characterized as a "contract for service . . . to or for" Mann's intellectual property and whether MediaNet furnished said service to Mann.

E-Filed

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | CV 13-5269-GHK (FFMx) | Date | November 27, 2013 |
|---|---|---|---|
| Title | *Aimee Mann v. MediaNet Digital, Inc., et al.* | | |

In considering this question, we are mindful of New York courts' directive that "the words 'service, maintenance or repair' in § 5-903 are to be generously read in order that their scope will engage the variegated evil that the statute was intended to meet." *Tel. Secretarial Serv. v. Sherman*, 284 N.Y.S.2d 384, 385-86 (App. Div. 1967). Here, Mann contends that MediaNet agreed to furnish its digital music services to Mann's compositions and that it is therefore bound by § 5-903. MediaNet offers no argument to rebut Mann's contention other than to say that it is "absurd." (Reply at 8). In light of the expansive reading courts have given § 5-903 and MediaNet's contractual obligations under the License Agreement, we agree with Mann. By the plain terms of the License Agreement, MediaNet agreed to furnish its digital music services on behalf of Mann's compositions. (FAC Ex. B, License Agreement at 1). It contracted to use its digital storage and security, streaming, and download technology to promote and distribute Mann's songs to its business partners and end-users. Because these services relate to personal property and this case does not fall "within the limited exception developed for 'personal services contracts,'" § 5-903 applies. *See Carbo Industries, Inc.*, 154 F. App'x at 219-220. MediaNet's blustering and conclusory labels do nothing to convince us that these services do not fall within § 5-903's ambit. That MediaNet's service is furnished online is immaterial: "there is no policy reason to restrict the application of this remedial statute which was aimed at a widespread abuse." *Tel. Secretarial Serv. v. Sherman*, 277 N.Y.S.2d 45, 47 (Sup. Ct. App. 1966). We therefore conclude that the services rendered by MediaNet in connection with Mann's property place it squarely within the scope of § 5-903. *See id.*; *Peerless Towel Supply Co. v. Triton Press, Inc.*, 160 N.Y.S.2d 163, 165 (App. Div. 1957).

Accordingly, the auto-renewal of the License Agreement is unenforceable under § 5-903. As such, Mann's allegation that MediaNet exploited her pre-December 5, 2003 and post-December 4, 2006 compositions after the initial term of the License Agreement states a claim for copyright infringement.[6]

### 3. Secondary Infringement Claims

Mann has also brought three claims against MediaNet for secondary copyright infringement: contributory infringement, vicarious infringement, and inducing infringement. MediaNet moves to dismiss these claims on the grounds that Mann has "simply allege[d] conclusions unsubstantiated by anything resembling facts." (Mot. at 16). We disagree. As established above, Mann has adequately pled a claim for direct infringement. To make out claims for secondary infringement as well, Mann only needs to allege a few additional elements. For contributory infringement, she need only allege that MediaNet's conduct induced, caused, or materially contributed to the infringing activity of others. *See* 3 Nimmer on Copyright § 12.04[A][3]. For inducement, she need only allege that MediaNet manifested a subjective intent that its service be used to infringe Mann's works. *Id.* § 12.04[A][4]; *see also Columbia Pictures Industries, Inc. v. Fung*, 710 F.3d 1020, 1037 (9th Cir. 2013). Finally, to state a claim for vicarious infringement, she need only allege that MediaNet had the right and ability to supervise its users' infringing activity and that it had a direct financial interest in the infringing activity. *Id.* § 12.04[A][2]. Mann adequately sets forth these factual allegations in her FAC by describing how

---

[6] In light of this conclusion, we need not consider Mann's alternative arguments for termination of the License Agreement.

E-Filed

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | CV 13-5269-GHK (FFMx) | Date | November 27, 2013 |
|---|---|---|---|
| Title | *Aimee Mann v. MediaNet Digital, Inc., et al.* | | |

MediaNet's service works and attaching the License Agreement, which explains the specifics of MediaNet's service in further detail. Because MediaNet's service functions (and MediaNet profits) by distributing music to its business partners and end users, Mann has done enough to set forth plausible claims for secondary infringement, especially given the standard on a motion to dismiss. Accordingly, we **DENY** MediaNet's Motion as to all of Mann's copyright claims.

### B. Rescission Claim

Under New York law, rescission is an "extraordinary remedy" available in only a few limited circumstances: "fraud in the inducement of the contract, failure of consideration, an inability to perform the contract after it is made, [and] substantial breach." *Robinson v. Sanctuary Record Grps, Ltd.*, 826 F. Supp. 2d 570, 575 (S.D.N.Y. 2011) (quoting *Krumme v. WestPoint Stevens, Inc.*, 238 F.3d 133, 143 (2d Cir. 2000)). It is also well settled that "rescission is an equitable remedy which will not be granted unless [Plaintiff] lack[s] an adequate remedy at law." *Id.* (citation omitted); *see also Callanan v. Powers*, 199 N.Y. 268, 284 (1910). Where the "harm plaintiff claims to have suffered is [a] financial loss" and "damages appear adequate," "rescission is inappropriate." *New Paradigm Software Corp. v. New Era of Networks, Inc.*, 107 F. Supp. 2d 325, 330 (S.D.N.Y. 2000) (quoting *New Shows, S.A. de C.V. v. Don King Productions, Inc.*, 2000 WL 354214, at *2 (2d Cir. April 6, 2000)); *see also Fink v. Friedman*, 358 N.Y.S. 2d 250, 259 (Sup. Ct. 1974) (explaining that a party is only entitled to rescission if she can show that her injury is "not . . . practically compensable by [a] money damage award").

Here, Mann bases her rescission claim on her allegation that MediaNet substantially breached the License Agreement by not honoring the contract's MFN provision and failing to make any royalty payments or provide any accounting statements after January 4, 2006. While MediaNet's alleged complete failure to comply with the terms of the License Agreement since January 4, 2006 might arguably constitute a substantial breach that goes to the essence of the contract, Mann has failed to explain why this non-payment of royalties could not be adequately remedied by monetary damages. This failure is fatal to her rescission claim. *See Robinson*, 826 F. Supp. 2d at 576. In her Opposition, Mann cites a single case, *Raftery v. World Film Corp.*, 167 N.Y.S. 1027 (1st Dep't 1917), to support her proposition that "having an adequate legal remedy does not preclude a claim for rescission where the breaches are substantial and fundamental and go to the root of the agreement." (Opp. at 18-19). But this very case contradicts her proposition, as it confirms that rescission is unavailable where "damages can be ascertained with reasonable certainty." *Rafferty*, 167 N.Y.S. at 1031 (quoting *Callanan*, 199 N.Y. at 284). Because there is nothing here to suggest that the calculation of damages would be anything other than straightforward, an equitable remedy would be inappropriate under governing New York law. *See, e.g.*, *New Paradigm Software Corp.*, 107 F. Supp. 2d at 330 (dismissing rescission claim where plaintiff had "asserted no reason why damages would not be an adequate remedy"); *Hotel Capital LLC v. Wells Fargo Bank*, 2012 WL 1506120, at *4 (Sup. Ct. 2012) ("As plaintiff has not demonstrated that it could not be adequately compensated by damages in this action . . ., the first cause of action seeking rescission . . . is dismissed."). Accordingly, Mann's rescission claim is **DISMISSED with leave to amend**. We are skeptical that Mann can adequately plead a rescission claim, but given that the rescission claim could potentially be refashioned into a viable breach of contract claim, we cannot

E-Filed

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | CV 13-5269-GHK (FFMx) | Date | November 27, 2013 |
|---|---|---|---|
| Title | *Aimee Mann v. MediaNet Digital, Inc., et al.* | | |

conclude that amendment would be futile.[7]

### IV. Conclusion

Based on the foregoing, MediaNet's Motion is **GRANTED in part** and **DENIED in part**. The Motion is **DENIED** as to Mann's copyright claims, but **GRANTED with leave to amend** as to her rescission claim. Mann shall file any Second Amended Complaint ("SAC") **twenty-one (21) days hereof**, and may only amend her rescission claim. If Mann files a SAC, MediaNet shall respond to the SAC **within twenty-one (21) days thereafter**. Mann's failure to file a SAC will be deemed her admission that amendment of the rescission claim is futile, and this claim will be deemed dismissed with prejudice insofar as it is based on a rescission theory. If Mann does not file a SAC, MediaNet **SHALL** answer the surviving portions of the FAC **within fourteen (14) days** after the date on which Mann's SAC must be filed.

**IT IS SO ORDERED.**

|  | -- | : | -- |
|---|---|---|---|
|  | Initials of Deputy Clerk | | Bea |

---

[7] We note, but do not decide here, that even if Mann were to allege that she lacks an adequate legal remedy, rescinding the License Agreement does not appear to allow her to retroactively assert infringement for MediaNet's uses of her songs that were authorized by the License Agreement – rescission would only revoke MediaNet's permission to use the songs going forward. *See* Nimmer on Copyright § 10.15[A] ("[U]pon . . . rescission, the . . . license is terminated and the copyright proprietor may hold his former grantee liable as an infringer for *subsequent* use of the work.") (emphasis added).